We'll move on to Texas Ujoints v. Dana. Mr. Webber. Good morning, Judge Poster, Judge Easterbrook, Judge Sykes. May it please the court, counsel. This appeal rises out of a summary judgment decision entered by the Honorable William Griesbach in the Northern Division of the Eastern District of Wisconsin, granting summary judgment in favor of Dana and dismissing my client's claims arising out of the Texas Fair Practices of Equipment Manufacturers, Distributors, Wholesalers, and Dealers, Chapter 57 of the Texas Business and Commerce Code. Your Honor, this case raises the question You say that Dana terminated Texas Ujoints, but did it ever accept it? It was never a distributor. It sort of allowed, you know, it sort of let the thing move along, but didn't make a contract with them, right? Well, Your Honor, we would respectfully disagree. We believe that the actual evidence submitted in support of our cross-motion for summary judgment proved as a matter of law that Dana did accept my client as a distributor who had acquired the rights. But they never signed anything. That's correct. Did they say you're a distributor now? Well, I believe they did in effect say that, not using those precise words and this goes to the definition of a dealer agreement under 57.002 sub 4. It is an oral or written agreement of definite or indefinite duration that provides for the rights and obligations of a supplier and dealer in the purchase or sale of equipment or repair Your Honor, it occurred in November of 2012 when my client had acquired the business many months earlier and Dana, who only has six of these authorized dealers for the entire country and Canada, their manager in charge of distributor relations was already aware that my client had acquired the business. Before he even had a personal face-to-face meeting with them, he acknowledged that there not only was a new business, but there had been a change in ownership and he recognized this through various signs. My client made no attempt to conceal or hide that fact and, in fact, in their first meeting, they directly confirmed for Dana's manager that, in fact, they had acquired the business. Yes, but there's a difference between having an agreement with your client and Dana simply taking a position, Well, let's see what happens, you know, before we go out and find a distributor. Let's see how this Texas U Joints is doing. And maybe if they do well, we'll offer them an agreement. But they decided eventually, no, we're not going to go with them. It doesn't sound like an agreement. Sounds like just letting things go along. See how they work out. No commitment on either side. You know, your joints could have gone away. Whether there is an agreement when there's a dispute over one is generally considered to be a question of fact. In this case, but I don't see what's the evidence that there was an agreement, a commitment, a promise. The commitment was made on November 2012 when, in response to being told we've acquired this dealership, Mr. Tom DeHaven, the manager in charge for Dana, said, I don't care what you do, you can do this as long as you maintain this longtime employee who we've had a long relationship with. My client accepts it and they move on. Not only does that occur on November, but then the subsequent actions confirm the acceptance of this transfer. There was an introduction to counterparts in Germany. There was a discussion that... You see, from Dana's standpoint, a change in ownership is not such a big deal. So they'll see how it works out. But the nice thing about it, from Dana's standpoint, there isn't any The district court, I think, correctly interpreted dealer agreement to require some manifest assent to the relationship in the form of an agreement or an arrangement, which is the words in 57.001 sub 2 defining dealer agreement. It includes those, not just a contract, but an agreement or an arrangement showing exactly the type of relationship that is customary and ordinary in this industry. And in fact, for over 50 years, iSCO, my client acquired the assets of, had been a dealer of Dana without any written agreement and had only had in place... And Judge Griesbach properly determined that because Dana recognized iSCO as an authorized the product from Dana, along with the standard terms and conditions for doing so, which limit the ability to acquire the equipment, describe how it had to be installed, provide it for specialty equipment to actually install and manufacture the product acquired, and then install for... Right. The predecessor was a dealer, as that term is understood in the Texas Act. The question is whether Texas U-Joints was a dealer. And if it's by virtue of having acquired the company, then the provisions in 57.154 kick in that that is good cause for termination without notice and cure. And so whether we look at it as an acquired dealership, Dana had the absolute right to terminate it based on the acquisition without its consent and the sale of all the assets without any notice and cure. Or if we look at it as a new agreement, then it has to be analyzed based on the context of what was going on after November and before the termination in June. And that was sort of a getting to know each other phase, as sales during that period, a due diligence going on on the part of Dana with the new firm, and then ultimately a decision not to enter into a more formal arrangement under the Act or even in more colloquial business terms. Your Honor, I respectfully disagree. When you look at the facts in the light most favorable to my client, the idea that Dana was just auditioning my client or going through a due diligence is really looking at it from their standpoint. And actually, those things were never said to my client. All the evidence suggested the contrary. There was a period of due diligence. Well, they were given various, you know, forms and paperwork to fill out to become a dealer, right? Well, actually, they were given everything that Dana puts in place for every one of its There wasn't a thing that Dana had left to do to make my client an authorized distributor that it hadn't done six months prior to termination. It had put in place all of the standard terms and conditions. It had put in place the requirements for acquiring specialty equipment. It had bought and sold product to my client, which it only does through authorized distributors. In fact, they had done absolutely everything that they always did with all their six other distributors with my client. They did that intentionally. They did it after they did a due diligence in October 2012. They made a determination at the November meeting that they were fine with the assignment. And they confirmed that in specific words to that effect. We don't care what you do as long as you keep this man on board. And then they continued to treat us in the ordinary course of dealing as they did all their distributors. And in the case of Reindeer versus Rain Bird, those factors were sufficient for this court to and expressly stated that, that it was renewed even after that dealer had been acquired by a competitor. And therefore, there was concern by the supplier and a multi-line dealer just like we have here that the dealer would not be using its best efforts to sell the product. And in that case... But the Texas Act contains these provisions about termination upon acquisition without consent or termination upon the sale of substantial or all assets of the dealer. And that's what distinguishes it from the Wisconsin Act. Well, in Reindeer versus Rain Bird, there were other good cause reasons that the supplier cited as a basis for the termination after the fact in the litigation. And the district court and this court held that you can't do that. You can't come into litigation later and cite a good... What does that have to do with Texas law? Well, it has... There's one thing I've noticed about your brief. You don't cite a single Texas case. Not one. This is a decision about the meaning of Texas law. Don't we need to know how Texas treats agreements like this and statutes like this? Unfortunately, Your Honor, there's no case that I'm aware of in Texas that interprets this Chapter 57. I will suggest that this court interpreted Texas law and Sally Butean concluded that distributor agreements... Why didn't you bring this lawsuit in Texas? Well, my clients were terminated and had to leave Texas. They had no ability to... Had to leave Texas? He was tarred and feathered and thrown out of the state? Well, they had no business to run there, unfortunately. This was the reason why they were located in Texas because they acquired this distributor located there. So there are no lawyers in Texas who are willing to represent people who now live in Wisconsin. Is that... Well, the members of the holding company are from Wisconsin. That's fine, but if you've got an open question of Texas law, the federal court can't do anything for you about it. We can construe the Texas law to mean what it says. If you want any... And your argument is, well, we shouldn't construe the Texas law to mean what it says. If you want anything other than that, you really need to be in Texas. Your Honor, I would respectfully again cite the Reindeers case where this court... Reindeers is a decision of the Eastern District of Wisconsin. In this Court of Appeals, it counts for nothing. District Court opinions have no precedential force in the Court of Appeals. I'm citing this Court's decision, the Seventh Circuit's decision, which is at 627 F. 2nd 44. That's a case where this Court... I'm sorry. That is a Seventh Circuit case. Also, in Sally Beauty, this Court, the Seventh Circuit interpreted a Texas distributor agreement and found that it was governed by the UCC, which allows for assignment absent a substantial interest against it, which again... So this contract... The central provision in this case is Texas Business and Commercial Code 57.154A4, not the UCC, right? The District Court originally thought it meant one thing, and on reconsideration thought it meant a different thing. We're not dealing with the UCC, which by the way, I note your brief doesn't discuss anyway. Your Honor, to the extent that we're talking about the requirement that the termination be for cause, which is what the Texas Act requires, that has been understood to mean that that has got to be the actual reason for termination. Dana never gave that as the reason for termination. It never had any interest in whether this was an asset or stock sale, which they could have terminated under... And what in Texas law requires that? It's 57.153, which states that there can be no termination without good cause. And then the notice requirement, which Judge Sykes just referred to and states that notice doesn't... 57.154A4 says that when a dealership is sold or transferred, that's an automatic ground for termination. Now, you want us to say that that just doesn't mean what it says. That's why I say you need to be in Texas. You might be able to persuade a Texas court of that, but here we are with the old language of the Texas statute in front of us, and it's our job to enforce it. Your Honor, I see my white light is on. My response to that is that my belief is that the evidence suggests, and the light most favorable to my client, that not only did Dana assent to this transfer, but it treated us as a dealer for over six months. And then it did not give the reason that the court is citing for the termination. What Texas case do you rely on for the proposition that selling goods establishes one as a dealer? Right? Texas might take that view, but you don't cite any Texas case that does take that view. I'll reserve the rest of my time for you. Now, I have a question for you. I think your position would really screw up distribution. I'm thinking of many years ago, the supermarket in Hyde Park was a dump called the Hyde Park Co-op. The very left wing, busy buying grapes picked by Cesar Chavez and so on that nobody wanted to eat. So finally, it was bought by Treasure Island, which is great. Now I'm sure that in the first six months, eight months, what have you, of Treasure Island's distributors who had supplied the Hyde Park Co-op? Because what was it going to do? It had to still be selling to people, and eventually it replaced them with its own suppliers. But similarly here, when all of a sudden there's a change in ownership, Dana figures, well, you know, we have to continue our business. So here's, it's just been a change of ownership. Maybe the new owners will be fine, so we'll let it ride. But if you treat that as a commitment, it greatly reduces the flexibility of a company to find, to switch distributors on the basis that maybe they don't like the new owners. The other side of this particular situation, Your Honor, to respond to that point is that my client was, the reason why it was terminated was it was doing too well. It wasn't doing too poorly. It hadn't been acquired by a competitor. It was doing so well that other distributors started complaining about that. One of the reasons behind the law itself is to protect the dealer that starts to do better. That is the basis of this statute, to prevent a grantor that has a superior power in taking away the product from doing so for an improper reason. Here, that's what happened, and we submit that the district forces... But if it was doing better, why wouldn't Dana be delighted? Great question. But the reason is that the other distributors were complaining. And so this is, this was part of our case. Well, do you accept that it was the other distributors complaining that made them... We have that in the record, Your Honor. And so that is part of the evidence that needs to be viewed in the light. That's a perfectly good reason. Well, it's not a good reason when you're talking about, when we're looking at market factors and whether it's good to have open competition and promoting a healthy dealer in Texas. So I would submit that under those rationales, the legislature of Texas was well within its purview to adopt this statute. It doesn't have a community of interest type requirement that Wisconsin does that takes into account, for example, how long a new dealer might have had this relationship ongoing. Thank you. Okay. Well, thank you, Mr. Weber. Mr. Cooper? Thank you. Counsel, Judge Easterbrook, Judge Posner, Judge Sykes, good morning. My name is Rod Cooper, and I'm here on behalf of Dana. May I please support you? Could you speak up a little? I'm having trouble hearing you. Yes, Your Honor. Dana never manifested a sense to enter into a formal or informal agreement with Texas U-Joints in perpetuity that would obligate Dana to distribute its GWB brand products through Texas U-Joints in perpetuity. And the district court correctly concluded that there was no dispute, no genuine dispute of fact that Dana didn't enter into any kind of agreement with Texas U-Joints. And the only facts that are material to that court's determination are not disputed. It's undisputed and indeed admitted by Texas U-Joints principal, Dan Zahn, that Dana at no time made any promises of any kind to Texas U-Joints about a future ongoing business relationship, and that nobody from Dana at any time promised that Dana would continue doing business with them. What about the, you can do anything you want as long as you keep this man, I guess that's Mr. Stoddard, on? Right. So Mr. Stoddard, who was a salesman at the old dealership, I-SCO, was in a meeting and he has testified that at some point in the meeting Tom DeHaven from Dana said, I don't care what you do or how you do it, I want Mr. Stoddard involved. There's a couple important things about that. First, I don't think that manifests assent to an agreement, an oral or written agreement. We'll get to that in a second. But perhaps more importantly, Texas U-Joints had acquired the assets of I-SCO some months earlier. In fact, there were two transactions. In August of 2012, Danmar Holdings LLC bought the assets of I-SCO, and Mr. Zahn was a principal in that entity, and they made a conscious decision not to tell Dana what they were doing, even though he, in discussions with the I-SCO ownership, said that he understood and knew that he was taking the risk that Dana could choose not to sell to him once Dana detects the change in ownership. And I think so that's something where this is not the way you start a business relationship with somebody. And so what's also undisputed about this November meeting from the testimony of both Mr. Zahn and Mr. Brown is that they did not disclose the separate corporate existence of Texas U-Joints at the November meeting. And also, Mr. Zahn testified no promises were made by Dana at the November meeting. The purpose was to discuss their business plans. But the fact that they don't disclose, it's undisputed that they don't disclose there had been a sale of assets, which would have given Dana good cause to terminate any dealer agreement that might have existed. But they also don't disclose the existence of Texas U-Joints. So it's hard to fathom how, at that point, what seems to be an off-the-cuff and perhaps disputed statement made by a Dana representative believing he's in agreement with Texas U-Joints, which is a separate legal entity. So getting back to the, I believe there's no evidence of an agreement here because there are no evidence of any promises by Dana to Texas U-Joints about an ongoing relationship. And despite the lack of evidence, you know, what is the agreement that Texas U-Joints is asking this court to infer exists? And Mr. Zahn testified himself that he was aware of nothing that would prohibit Dana from refusing to sell GWB products to either ISCO or Texas U-Joints, and that it was Dana's prerogative not to make any sale. So there are really, the record is devoid of evidence of any ongoing obligations on Dana's part that could create an agreement. Ignoring the lack of evidence and notwithstanding the fact that Texas U-Joints' principal has also admitted that Dana never communicated to Texas U-Joints that Texas U-Joints could be an authorized dealer of GWB products, Texas U-Joints is arguing that Dana must continue to do business with them essentially because Dana waited too long to decide whether or not they wanted to make them a dealer. So the argument is not that Dana told them they were a dealer, but that Dana didn't tell them they weren't. And this is simply insufficient as a matter of law to create a protectable dealer agreement under the Texas Act. A dealer agreement is defined under the Act as a written or oral agreement or arrangement. An arrangement is defined in Webster's as noted by Judge Griesbach in his initial opinion on the summary judgment motions is defined as an informal agreement. So you need an oral or written agreement. In other words, an express agreement. And here, Texas U-Joints is not even arguing that there was an express agreement. They're arguing that Dana should be forced into a relationship without Dana giving them forms and that kind of a thing, conduct, while admitting Dana never made any promises, oral or written, for an ongoing relationship. And the statute doesn't allow that to occur and there's a good reason for that because of the extremely broad protection that a dealer would get under the Act. I wanted to talk about the Renders case since we took a while discussing that with Mr. Weber. So as Judge Sykes, as you pointed out, obviously 57.154A4 allows the supplier to terminate a dealer agreement, have good cause to terminate a dealer agreement without notice or opportunity to cure when there's a sale of assets. So the Renders case really, under the Wisconsin Fair Dealer Law, has no application here. There was no specifically statutorily enumerated good cause provision in the Wisconsin law that the court was grappling with. It also said that Mr. Weber had the facts backwards there. It wasn't a situation where a dealer had been acquired or had new ownership. There what had happened was a dealer had acquired another entity and it was still the same dealer. There was no new ownership at the dealer. And in any event, that case has no application I think primarily because here the Texas legislature has stated that the sale of assets is good cause. And it's good cause to terminate any agreement that might have existed without notice or opportunity to cure to the dealer. I just point out as to what Judge Posner was alluding to, I think that this would really come as a surprise to the public when attempting to evaluate whether to enter into a long-term relationship with a potential business partner, you could get stuck into a perpetual relationship by just making a few isolated sales or giving them standard terms and conditions and price lists without a promise of an ongoing relationship. And Judge Griesbach noted that in his opinion this would come as a surprise to suppliers and dealers alike and would be an extraordinary result. And I think it's that result that has been avoided by the correct decision by Judge Griesbach in this case to find that as a matter of law, there was simply no evidence that Dana ever manifested assent to enter into an agreement with Texas UJOYS. And I think that the inquiry is the same whether you're looking at whether Dana was seeking to, I'm sorry, the answer is the same. Dana didn't manifest an assent to approve an assignment, nor did they request an assent to approve enter into a direct agreement, and I think that the analysis there is the same. And with respect to not approving an assignment, Dana throughout this audition period where they were dealing with a new start-up company who was telling them they're going to grow the business from zero to $5 million a year, Dana was smart to listen to that, to hear them out, to look for a business plan before cutting them off. And they thought they were dealing with ice go, and they were not. And so the very first notice that Dana had that there had been an asset sale was in June. And so Texas UJOYS shouldn't benefit from not being forthright with Dana in the first instance. Unless the Court has any questions. Okay. Thank you, Mr. Kruger. Mr. Weber, do you have anything further? Thank you, Your Honor. To address the last point made by counsel, it is a question of fact what Dana knew in October of 2012 more than seven, eight months before the date that he has just indicated was their first knowledge that there was an asset sale. We have evidence in the record that their manager saw a change in ownership in a new business before he even had the November meeting with them. I did want to correct myself if I misstated the Reinders case versus Rainbird as being a case where the dealer was acquired by the competitor. That was the Sally Beauty case. Reinders involved acquiring a competing line. And in that case, this Court held that the action of continuing to deal with the plaintiff as a dealer constituted the renewal of the agreement by action. It was the year-to-year conduct of the parties that represented a part of the agreement within the act. And again, the choosing to deal with one another in the usual terms. Those were this Court's words in the Reinders case, and they apply equally here. Just as Judge Griesbach found that the conclusion with respect to the dealer agreement applied to the former, it does apply to my client. There is evidence in the record when viewed in the light most favorable of my client that they did mutually assent to continue that dealer agreement under the same terms as previously. If there are no other questions, on the basis of that and our briefing, we would ask that the District Court's decision be reversed and the case remanded. Thank you.